JOHN B. CLINTON *v.* MICHAEL E.
ASPINWALL ET AL.
(SC 21072)

McDonald, D'Auria, Ecker, Alexander and Dannehy, Js.

*Syllabus*

The defendants, three members and managers of C Co., a Delaware limited
liability company, appealed from the judgment of the trial court, rendered
after a jury trial, in favor of the plaintiff, a former member and manager of
C Co., on his breach of contract claim. The plaintiff had alleged that the
defendants breached their contractual duties under a duty of care provision
in C Co.'s operating agreement by, inter alia, removing the plaintiff as a
member of C Co. and by maintaining an allegedly unnecessary $3 million
capital reserve fund. The first sentence of the duty of care provision required
managers to exercise their best judgment in carrying out C Co.'s operations
and in performing their other duties under the agreement, whereas the
second sentence provided that a manager would not incur any liability in
performing his duties, unless any act or omission on the part of the manager
was the result of gross negligence or wilful misconduct, or unless the man-

Clinton *v.* Aspinwall

ager did not act in good faith. On appeal, the defendants claimed, inter alia, that the trial court had incorrectly interpreted the second sentence of the duty of care provision as imposing affirmative duties on the defendants, instead of as an exculpatory provision, and had improperly instructed the jury in accordance with that flawed interpretation. *Held*:

The trial court incorrectly construed the second sentence of the duty of care provision as imposing affirmative contractual duties on the defendants, and, because this court could not say that the court's instructions fairly presented the plaintiff's breach of contract claim to the jury in such a way that injustice was not done to the defendants, this court reversed the trial court's judgment, remanded the case for a new trial, and vacated the court's posttrial awards of attorney's fees, costs, and interest.

The second sentence of the duty of care provision was a quintessential exculpatory provision under Delaware law that did not create obligations or duties but, rather, served as a limitation on liability, as it was clearly aimed at eliminating the availability of damages as a remedy for a manager's breach of duty, unless the breach was the result of the manager's gross negligence, wilful misconduct, or failure to act in good faith.

The trial court improperly instructed the jury on the defendants' duties under the operating agreement when it stated that the exculpatory provision prohibited the managers of C Co. from taking actions that are in bad faith or that constitute gross negligence or wilful misconduct, and that the plaintiff's allegations were based on the defendants having had either a bad faith purpose or no good faith basis for their actions, as the references to the defendants' allegedly bad faith purposes and the prohibition on actions constituting gross negligence or wilful misconduct came directly from language in the exculpatory provision, which did not give rise to any contractual duties on the part of the defendants.

Moreover, the trial court compounded its error by repeatedly instructing the jury that the defendants asserted as special defenses that they had complied with the terms of the operating agreement in general, and with the exculpatory provision in particular, and that they had acted in good faith and without gross negligence or wilful misconduct, as those instructions improperly suggested that such actions were elements of the plaintiff's breach of contract claim and required the defendants to disprove those so-called elements.

The trial court's instructional error was further exacerbated by its additional instruction on the jury's role in interpreting the provisions of the operating agreement, because, instead of conducting its own pretrial analysis of the relevant provisions to determine whether they were ambiguous and whether extrinsic evidence should be considered in their interpretation, the court improperly delegated those functions to the jury.

352 Conn. 597 JULY, 2025 599

Clinton *v.* Aspinwall

The trial court's instructional errors were harmful insofar as they allowed the jury to find the defendants liable for acting in bad faith or with gross negligence or wilful misconduct, even though the defendants did not owe those duties to the plaintiff, imposed on the defendants the burden of disproving what the court had misdescribed as elements of the plaintiff's breach of contract claim, and allowed the jury to decide whether the relevant provisions of the operating agreement were ambiguous and whether to consider extrinsic evidence, which likely influenced the jury in reaching a verdict for the plaintiff.

The trial court did not abuse its discretion in admitting the testimony of the plaintiff's expert witness, a certified public accountant, about the propriety of the $3 million capital reserve fund.

The expert's areas of special skill or knowledge were directly related to the matters at issue, the testimony regarding the capital reserve fund was a subject that was not within the common knowledge of the average person, the expert appropriately relied on the operating agreement to ascertain the purpose of the capital reserve fund, and, notwithstanding the defendants' claim to the contrary, this court was unaware of any authority that required the expert to base his opinion on a particular formula or standard of care in order for his testimony to be admissible under the provision of the Connecticut Code of Evidence (§ 7-2) governing the admissibility of expert testimony.

(*One justice concurring separately*)

Argued February 5—officially released July 29, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Robaina, J.*, granted the plaintiff's motion for summary judgment with respect to the defendants' counterclaim; thereafter, the case was tried to the jury before *Shapiro, J.*; verdict for the plaintiff on his breach of contract claim; subsequently, the defendants appealed to the Appellate Court; thereafter, the court, *Shapiro, J.*, denied the defendants' motions to set aside the verdict and for judgment notwithstanding the verdict and rendered judgment in accordance with the verdict, and the defendants filed an amended appeal; subsequently, the court, *Hon. Robert B. Shapiro*, judge trial referee, granted the plaintiff's motion for attorney's fees and

Clinton *v.* Aspinwall

costs, and the defendants filed a second amended appeal and a separate appeal with the Appellate Court, which consolidated the appeals; thereafter, the Appellate Court, *Lavine, Alvord* and *Harper, Js*., reversed in part the trial court's judgment and remanded the case with direction to render judgment in part for the defendants and for further proceedings; subsequently, the defendants and the plaintiff, on the granting of certification, filed separate appeals with this court, which substituted Lynn P. Young, executrix of the estate of David W. Young, for David W. Young as a defendant; thereafter, this court vacated the Appellate Court's judgment and remanded the case to that court with direction to dismiss the defendants' appeals; subsequently, the court, *Hon. Robert B. Shapiro*, judge trial referee, granted the plaintiff's motion for additional attorney's fees and for postjudgment interest; thereafter, the plaintiff withdrew the count of the complaint alleging breach of fiduciary duty, and the defendants appealed. *Reversed*; *vacated*; *new trial*.

*Garrett S. Flynn*, with whom was *Barbara M. Schellenberg*, for the appellants (defendants).

*Howard Fetner*, with whom was *Glenn W. Dowd*, for the appellee (plaintiff).

*Opinion*

DANNEHY, J. This corporate governance dispute involving CCP Equity Partners, LLC (CCP), a Delaware limited liability company, requires us to determine whether the trial court properly interpreted certain provisions of the company's operating agreement in accordance with Delaware law. The defendants, Michael E. Aspinwall, Steven F. Piaker, and David W. Young,[1]

_____

[1] On June 26, 2021, during the pendency of this case, the defendant David W. Young died. The plaintiff filed a motion to substitute Lynn P. Young, as executrix of the estate of David W. Young, for the defendant David W. Young, which this court granted. For convenience, however, we refer to David W. Young throughout this opinion by his last name and as one of the defendants.

352 Conn. 597 JULY, 2025 601

Clinton *v.* Aspinwall

appeal from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, John B. Clinton, on the plaintiff's breach of contract claim. The defendants' principal claim on appeal is that the trial court committed reversible error by improperly interpreting an exculpatory clause in CCP's operating agreement as imposing affirmative duties on the defendants and instructing the jury in accordance with that flawed interpretation. They also claim that the trial court abused its discretion by permitting the plaintiff's expert, Kenneth Pia, to testify about CCP's capital reserve. We agree with the defendants on their first claim but disagree with them on their second claim. Because the error on their first claim was not harmless, we reverse the judgment of the trial court and remand the case for a new trial.[2]

I

Beginning in 1992, the plaintiff led a private equity group at Conning Capital Partners (Conning). Piaker joined Conning in 1995, followed by Young and Aspinwall sometime in 2001 or 2002. Soon after Young and Aspinwall joined Conning, Conning's owner decided that it no longer wished to be in the private equity business. The plaintiff, with the help of others, negoti-

---

[2] Although our conclusion on the defendants' first claim is dispositive of the defendants' appeal, we nevertheless address their claim regarding the testimony of the plaintiff's expert witness because it is likely to arise again on remand. See, e.g., *State* v. *Williams*, 350 Conn. 363, 384 n.14, 324 A.3d 760 (2024). The defendants also claim that the trial court improperly (1) admitted certain parol evidence that varied the meaning of § 8.1 of CCP's operating agreement, and (2) denied two posttrial motions that they filed. It is not evident to us, however, that these other claims will arise on remand given our disposition. See, e.g., *State* v. *Courchesne*, 296 Conn. 622, 633 n.16, 998 A.2d 1 (2010). Further, as to the defendants' § 8.1 claim, the defendants concede that the plaintiff's theory of a breach of contract, premised on a violation of § 8.1, collapsed at trial and that the plaintiff never asked the trial court to instruct the jury as to that claim. For that additional reason, we are not persuaded that claim is likely to arise on remand, and, therefore, we decline to review it in this appeal.

Clinton *v.* Aspinwall

ated a deal with Conning's owner to take over two investment funds that had been previously raised. To effectuate the spinoff of the two funds, the parties, in addition to two other individuals, Gerard Vecchio and Preston Kavanagh, created CCP.

On December 29, 2003, the plaintiff, the defendants, Vecchio, and Kavanagh entered into an Amended and Restated Limited Liability Company Agreement for the operation of CCP (agreement). These individuals were the initial "members" of CCP (i.e., the owners of the company) under the agreement. Each member was also a "Manager," as that term is defined in the agreement, and served on the board of managers. The agreement, which the parties agreed would be governed by Delaware law,[3] entrusted the board of managers, but not the members, with the management of CCP. The principal purpose of CCP was to provide management services to its investment funds.

In August, 2005, the board of managers established a $3 million capital reserve for the future expenses of CCP.[4] The purpose of the capital reserve was to keep money within CCP in the event of an unforeseen circumstance or contingency that required the payout of CCP capital, such as a "Repurchase Event" (i.e., a member withdrew or was removed from the company) under § 10.3 of the agreement, pursuant to which CCP was required to repurchase the member's interest in the company for a sum equal to his capital account, minus his pro rata share of the capital reserve.

_____

[3] Section 15.5 of the agreement provides: "This Agreement shall be construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any jurisdiction other than the State of Delaware."

[4] Pursuant to § 3.2 (a) (xiii) of the agreement, the managers have the power to "establish from time to time a capital reserve for future expenses of the Company." The managers of CCP at the time the capital reserve was established were the plaintiff, the defendants, and Kavanagh. Vecchio left CCP on June 30, 2004.

Clinton *v.* Aspinwall

In 2006, the members, who at that time included the parties and Kavanagh, amended § 8.1 of the agreement (2006 amendment). Before the 2006 amendment, § 8.1, titled "General Distributions," provided: "Subject to applicable law and except as otherwise provided in Section 8.5, the Company shall make distributions to the Members at such times and in such aggregate amounts as may be determined by the Board of Managers, in its sole discretion. Each such distribution shall be made pro rata among the Members in proportion to their relative Capital Accounts as of the date of the applicable distribution." The 2006 amendment changed the last sentence of § 8.1 to provide: "Each such distribution shall be made pro rata among the Members in proportion to their relative Capital Accounts as of the date of the applicable distribution, *unless otherwise determined and agreed by all of the Members and subject to the remainder of this Section VIII*."[5] (Emphasis in original.)

In 2008, the defendants, who at that time collectively held a 61 percent interest in CCP, made additional amendments to the agreement (2008 amendments) pursuant to § 2.5, which permitted amendments to the agreement when members holding 60 percent or more of the interest in CCP consented to them.[6] The 2008 amendments changed, among other things, each member's percentage interest and the method of allocating income to each member's capital account. They also made it so that a member's death or disability would not require CCP to repurchase his interest.

Five years later, the defendants voted to remove the plaintiff as a member of CCP pursuant to § 2.5 of the

---

[5] The phrase "and subject to the remainder of this Section VIII" has no bearing on this dispute. (Emphasis omitted.)

[6] Section 2.5 of the agreement provides in relevant part: "In addition to the other matters specified hereunder, subject to the prior approval by the Board of Managers, the consent of Members holding 60% or more of the Percentage Interests shall be required for . . . (ii) the removal of a Member other than on account of death or voluntary resignation . . . and (vii) any amendment to this Agreement."

Clinton *v.* Aspinwall

agreement.[7] See footnote 6 of this opinion. The plaintiff had served as managing partner of CCP from December, 2003, until March, 2008, and was a manager of CCP from its formation in 2003 until he was removed in 2013.

The plaintiff then brought the present action. The operative complaint alleged that the defendants breached their contractual duties under the agreement by making the 2008 amendments (amendment claim),[8] voting to remove the plaintiff as a member of CCP (removal claim), and maintaining a capital reserve fund of $3 million when it was no longer needed (capital reserve claim).[9] The plaintiff alleged that each of these actions was taken in violation of the duty of care provision set forth in § 3.4 of the agreement[10] and that the 2008 amendments also violated § 8.1 of the agreement, as amended.[11]

[7] Kavanagh had previously been removed from CCP in October, 2008.

[8] The plaintiff alleged that the defendants represented to him that the 2006 amendment to § 8.1 of the agreement "lock[ed] in the members' economics" and that the 2008 amendments made by the defendants violated that provision by, inter alia, altering each member's percentage interests in CCP. The plaintiff further alleged that the 2008 amendments had the effect of reducing his percentage interest in CCP and the balance of his capital account while increasing the defendants' percentage interests and the balances of their capital accounts.

[9] By maintaining the capital reserve at $3 million, the plaintiff alleged that the defendants effectively reduced the amount he received when CCP repurchased his interest upon his removal as a member, as a member's payout is reduced by his pro rata share of the capital reserve.

[10] Section 3.4 of the agreement provides in relevant part: "The Managers shall exercise their best judgment in conducting the Company's operations and in performing their other duties hereunder. The Managers shall not incur any liability to the Company, any Member or any other Person for any loss suffered by the Company or such other Member or Person which arises out of any action or omission of the Managers . . . in performing the Managers' duties hereunder, provided, however that (i) the Managers . . . acted in good faith and in a manner such Person reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful, and (ii) such course of conduct did not constitute gross negligence or willful misconduct of the Managers . . . ." (Emphasis in original.)

[11] The plaintiff also brought a fiduciary duty claim against the defendants, which he voluntarily withdrew, that is not at issue in the present appeal.

Clinton *v.* Aspinwall

The defendants filed a motion to strike in December, 2014, and a motion for summary judgment in December, 2016, both of which were denied by the trial court. Prior to trial, the defendants also filed a motion in limine to preclude the plaintiff from introducing parol evidence to vary the meaning of the unambiguous contract language that they argued was contained in both §§ 3.4 and 8.1 of the agreement. Specifically, the defendants argued that the court was "obligated to perform an independent pretrial analysis" of those provisions to determine whether the provisions were clear and unambiguous. If they were unambiguous, the plaintiff would be precluded from introducing parol evidence or argument at trial to vary their terms. As to § 3.4 of the agreement, the defendants argued that the second sentence of that section is an exculpatory provision under Delaware law and did not create any duty or contractual obligation. The defendants requested that the court rule, as a matter of law, that the second sentence of § 3.4 cannot form a basis of a breach of contract claim. With respect to § 8.1 of the agreement, as amended, the defendants similarly argued that the provision was clear and unambiguous on its face and that, contrary to the plaintiff's assertions, it did not preclude the defendants' ability to amend the agreement in 2008, to remove the plaintiff in 2013, or to apply CCP's $3 million capital reserve in calculating the amount CCP used to repurchase the plaintiff's interest. The defendants, therefore, moved to preclude the plaintiff from introducing any evidence or argument to suggest otherwise.

The trial court denied the defendants' motion in limine. It concluded that "[t]he defendants' arguments regarding §§ 3.4 and 8.1, as amended, of the . . . agreement at issue were previously the subject of other decisions in this case by other judges" and that "[t]he motion in limine, in essence, [sought] reargument as to certain

Clinton *v.* Aspinwall

aspects of those decisions.''[12] The court stated that
''§ 8.1 is relevant to the plaintiff's claims and § 3.4 [is]
to be read together with other provisions of the agree-
ment to ascertain meaning,'' that it ''decline[d] to cate-
gorically exclude the general subject matter alluded to
in the defendants' motion,'' and that ''[w]hat evidence
is admitted at trial remains to be determined.''

The parties tried the case to a jury.[13] The jury awarded
the plaintiff $146,901 for breach of contract on the
amendment claim, $672,208 for breach of contract on
the removal claim, and $303,426 for breach of contract
on the capital reserve claim.[14] The trial court denied
the defendants' motions for judgment notwithstanding
the verdict and to set aside the verdict and, after an
evidentiary hearing, granted the plaintiff's motion for
attorney's fees and costs pursuant to the agreement,
awarding the plaintiff $716,200 in attorney's fees and
$6118.75 in costs.

The defendants appealed to the Appellate Court,
which affirmed in part and reversed in part the judgment
of the trial court and remanded the case for a new
hearing on the issue of attorney's fees and costs. *Clinton*
v. *Aspinwall*, 200 Conn. App. 205, 229, 238 A.3d 763
(2020), vacated, 344 Conn. 696, 281 A.3d 1174 (2022).
The plaintiff and the defendants each filed with this
court a petition for certification to appeal from the
Appellate Court's judgment, both of which were granted.

---

[12] The trial court's reference to ''other decisions in this case by other
judges'' appears to be in reference to the decisions denying the defendants'
motion to strike and motion for summary judgment.

[13] We note that the plaintiff never ultimately asked the trial court to instruct
the jury to determine whether § 8.1 of the agreement or some alleged parol
agreement surrounding the amendment to § 8.1 was breached by the defen-
dants. The plaintiff's case, therefore, was predicated solely on alleged viola-
tions of § 3.4 of the agreement.

[14] The total amount of the jury's damages award equals the sum of damages
that the plaintiff's expert, Kenneth Pia, had calculated and testified to on
the basis of an assumption that the plaintiff had remained at CCP through
the end of 2016, instead of being removed in 2013.

352 Conn. 597 JULY, 2025 607

Clinton *v.* Aspinwall

*Clinton* v. *Aspinwall*, 335 Conn. 980, 241 A.3d 703 (2020); *Clinton* v. *Aspinwall*, 335 Conn. 979, 241 A.3d 704 (2020). This court ultimately vacated the Appellate Court's judgment on the basis that the court lacked subject matter jurisdiction over the defendants' consolidated appeals because the defendants did not appeal from a final judgment. *Clinton* v. *Aspinwall*, 344 Conn. 696, 699, 281 A.3d 1174 (2022). On remand to the trial court, the plaintiff withdrew the claim that had been unadjudicated. See footnote 11 of this opinion. The plaintiff also filed a motion for interest and additional attorney's fees, which the trial court granted in part.[15] The defendants subsequently appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

II

The defendants claim that the trial court committed reversible error by construing the second sentence of § 3.4 of the agreement as imposing affirmative contractual duties on the defendants. They contend that the provision is an exculpatory clause under Delaware law that does not create obligations or duties but, rather, serves as a limitation on liability. They argue that the court's interpretation of the agreement, as evidenced by the court's jury instructions, was harmful and requires a new trial. We agree with the defendants.

When reviewing a challenged jury instruction, we look at the charge to the jury in its entirety to determine its total effect rather than at its individual component parts. See, e.g., *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 289, 838 A.2d 135 (2004). We must determine whether the jury charge "fairly presents the case to the jury in such a way that

---

[15] The trial court awarded the plaintiff $493,069.99 in additional attorney's fees and $555,608.51 in postjudgment interest.

Clinton *v.* Aspinwall

injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *Burke* v. *Mesniaeff*, 334 Conn. 100, 116, 220 A.3d 777 (2019). "As long as [the instructions] are correct in law, adapted to the issues [in the case], and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *Stafford* v. *Roadway*, 312 Conn. 184, 189, 93 A.3d 1058 (2014).

The defendants' claim also involves a question of contract interpretation, an issue over which our standard of review is well known.[16] The interpretation of a contract, being a "determination of the parties' intent," is ordinarily a question of fact that "is subject to reversal on appeal only if it is clearly erroneous." (Internal quotation marks omitted.) *Murtha* v. *Hartford*, 303 Conn. 1, 8, 35 A.3d 177 (2011). When there is definitive contract language, however, the determination of what the parties intended by their commitments is a question of law over which our review is plenary. See, e.g., *Poole* v. *Waterbury*, 266 Conn. 68, 88–89, 97, 831 A.2d 211 (2003).

A

Under Delaware law, the law under which the agreement must be construed, courts "start with the text" to determine what the contractual parties intended. *Sunline Commercial Carriers, Inc.* v. *CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). "In upholding the intentions of the parties, [Delaware] court[s] . . . construe the agreement as a whole, giving effect to all provisions therein." (Internal quotation marks omitted.) *GMG Capital Investments, LLC* v. *Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). To aid

---

[16] Although the agreement contains a choice of law provision that requires the agreement to be construed in accordance with Delaware law, procedural issues such as the standard of review are governed by Connecticut law. See, e.g., *Ferri* v. *Powell-Ferri*, 326 Conn. 438, 447, 165 A.3d 1137 (2017).

Clinton *v.* Aspinwall

in the interpretation of the text's meaning, "Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." (Internal quotation marks omitted.) *Osborn ex rel. Osborn* v. *Kemp*, 991 A.2d 1153, 1159 (Del. 2010). "When the contract is clear and unambiguous, [Delaware courts] will give effect to the [plain meaning] of the contract's terms and provisions, without resort to extrinsic evidence." (Internal quotation marks omitted.) *Sunline Commercial Carriers, Inc.* v. *CITGO Petroleum Corp.*, supra, 846. Delaware courts "do not consider extrinsic evidence unless [they] find that the text is ambiguous. Ambiguity is present only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Critically, a contractual provision is not rendered ambiguous simply because the parties in litigation differ as to the proper interpretation." (Footnotes omitted; internal quotation marks omitted.) *Cox Communications, Inc.* v. *T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022).

Section 3.4 of the agreement provides in relevant part that "[t]he Managers shall exercise their best judgment in conducting the Company's operations and in performing their other duties hereunder. The Managers shall not incur any liability to the Company, any Member or any other Person for any loss suffered by the Company or such other Member or Person which arises out of any action or omission of the Managers . . . in performing the Managers' duties hereunder, provided, however that (i) the Managers . . . acted in good faith and in a manner such Person reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Person's conduct was unlawful, and (ii) such course of

Clinton *v.* Aspinwall

conduct did not constitute gross negligence or willful misconduct of the Managers . . . . The Managers . . . shall be fully protected and justified with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice as to matters of law of legal counsel, or as to matters of accounting of accountants, selected by any of them with reasonable care. In addition, the Managers . . . shall be entitled to indemnification by the Company to the extent provided in Article XIV hereof.''

The defendants claim that the second sentence of § 3.4 of the agreement is an exculpatory clause under Delaware law that limits liability and not one that creates contractual duties. They point to numerous cases, including *Fisk Ventures, LLC* v. *Segal*, Docket Civil Action No. 3017-CC, 2008 WL 1961156 (Del. Ch. May 7, 2008), aff'd, 984 A.2d 124 (Del. 2009), a Delaware Court of Chancery decision that was summarily affirmed by the Delaware Supreme Court. The court in *Fisk Ventures, LLC*, was tasked with determining whether the operating agreement in that case, which provided in relevant part that ''[n]o [m]ember, [r]epresentative, or [o]fficer of the [c]ompany shall be liable to the [c]ompany or to any [m]ember . . . unless the loss or damage shall have been the result of gross negligence, fraud or intentional misconduct,'' established a duty to act without gross negligence, fraud or intentional misconduct. (Internal quotation marks omitted.) Id., *9. The court concluded that the clause did not create a duty or code of conduct but, rather, operated as a limitation on liability. Id. The court rejected the request to convert an expressly exculpatory provision into ''an all encompassing and seemingly boundless standard of conduct.'' Id.

Clinton *v.* Aspinwall

The plaintiff contends that *Fisk Ventures, LLC,* is inapposite to the facts of the present case because the agreement at issue in that case did not involve any "best judgment" provision like the "best judgment" provision found in the first sentence of § 3.4 of the agreement. He argues that, because the first sentence of § 3.4 imposes a duty on the managers to "exercise their best judgment," the second sentence must be read in context with that duty. In his view, an objective, reasonable third party would understand the second sentence of § 3.4 as creating a duty for managers to refrain from acting in bad faith or engaging in gross negligence or wilful misconduct.

In reviewing the language of § 3.4 of the agreement, we agree with the defendants that the second sentence of that provision is an exculpatory provision under Delaware law that does not create additional duties under the agreement. See, e.g., *Inter-Marketing Group USA, Inc. ex rel. Plains All American Pipeline, L.P.* v. *Armstrong,* Docket C.A. No. 2017-0030-TMR, 2020 WL 756965, *6 (Del. Ch. January 31, 2020); *Feeley* v. *NHAOCG, LLC,* 62 A.3d 649, 664–65 (Del. Ch. 2012); *Dawson* v. *Pittco Capital Partners, L.P.,* Docket C.A. No. 3148-VCN, 2012 WL 1564805, *28 (Del. Ch. April 30, 2012); *Fisk Ventures, LLC* v. *Segal,* supra, 2008 WL 1961156, *9; cf., e.g., *Metro Storage International, LLC* v. *Harron,* 275 A.3d 810, 847 (Del. Ch. 2022). Although the plaintiff is correct that the first sentence of § 3.4 imposes a duty on managers to "exercise their best judgment" in conducting CCP's operations and in performing their other duties under the agreement, the plain and unambiguous language of the second sentence of § 3.4 limits liability; it does not create it. The provision, read in context, is clearly aimed at eliminating the availability of money damages as a remedy for a breach of duty, subject to the enumerated exceptions. The second sentence of § 3.4 provides in relevant part that "[t]he Man-

agers *shall not incur any liability to* . . . any Member . . . for any loss suffered by . . . such other Member . . . which arises out of any action or omission of the Managers," subject to the exceptions. (Emphasis added.) That is a quintessential exculpatory provision under Delaware law, which Delaware courts have made clear does not give rise to any separate contractual duty. See, e.g., *Fisk Ventures, LLC* v. *Segal*, supra, *9. The second sentence of § 3.4, therefore, comes into play in this case only after the fact finder determines that there was a breach of the agreement.[17] See, e.g., *Gatz Properties, LLC* v. *Auriga Capital Corp.*, 59 A.3d 1206, 1216 (Del. 2012) (addressing exculpation after breach is established). The provision limits managers' liability to members unless the breach was the result of gross negligence or wilful misconduct, or the manager did not act in good faith.

B

Notwithstanding the exculpatory nature of that provision, the defendants argue that the trial court improperly interpreted the second sentence of § 3.4 of the agreement as creating a duty that prohibited them from taking actions under the agreement in bad faith, with gross negligence, or with wilful misconduct, and instructed the jury in accordance with that flawed interpretation.[18]

---

[17] See footnote 10 of this opinion.

[18] The plaintiff makes a few suggestions throughout his brief that the defendants failed to preserve their claim regarding the court's jury instructions on § 3.4 of the agreement. We do not agree. The record shows that the defendants repeatedly and consistently argued that the second sentence of § 3.4 did not create any contractual duties on the defendants. For example, the defendants filed a motion in limine, expressly arguing this point, and, at the hearing on the motion, the defendants' counsel expressly argued: "[I]f the jury gets an instruction or hears argument that [the defendants] had a duty under the second sentence, it will be extremely prejudicial and incorrect." The defendants also filed a written request to charge that would have expressly prohibited the jury from considering the exculpatory clause in § 3.4 as a source of duties and required the jury to disregard all evidence and argument to that effect. See, e.g., *Stokes* v. *Norwich Taxi, LLC*, 289 Conn. 465, 469–70 n.3, 958 A.2d 1195 (2008) ("[i]t is well established that a

Clinton *v.* Aspinwall

We therefore turn our attention to the jury instructions to determine whether they were correct in law and presented to the jury in such a way that injustice was not done.

The trial court instructed the jury in relevant part: "The second element of the plaintiff's breach of contract claim is that the defendants breached the agreement. In this case, the plaintiff claims that the defendants breached § 3.4, the duty of care provision of the . . . agreement on three occasions. Section 3.4 requires the managers of CCP to exercise their best judgment in conducting the company's operations and in performing their other duties under the . . . agreement and prohibits actions that are taken in bad faith or with gross negligence or wilful misconduct.

"Bad faith is synonymous with the absence of good faith, which in turn means honesty and fact and the observance of reasonable standards of fair dealings. A determination will be considered to be in good faith unless it went so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith. Wilful misconduct means intentional wrongdoing, not mere negligence, gross negligence or recklessness. And wrongdoing means malicious conduct or conduct designed to defraud or seek an unconscionable advantage. Gross negligence means conduct that constitutes reckless indifference or actions that are without the bounds of reason.

party may preserve for appeal a claim that an instruction was defective either by: [1] submitting a written request to charge the covering matter; or [2] taking an exception to the charge as given" (internal quotation marks omitted)). The defendants' counsel also made similar arguments in his oral motion for a directed verdict, specifically taking issue with the plaintiff's proposed jury instructions interpreting § 3.4, and also during argument on the defendants' posttrial motion for judgment notwithstanding the verdict in which it was evident that the court was well aware of the defendants' position on § 3.4 taken throughout the litigation.

Clinton *v.* Aspinwall

"First, the plaintiff claims that the defendants breached the duty of care provision by amending the . . . agreement in 2008. The plaintiff claims that the defendants enacted the 2008 amendment[s] for the bad faith purpose of decreasing the amount of compensation that [the plaintiff] and . . . Kavanagh would receive and increasing the amount of compensation that the defendants would receive. The defendants do not dispute that they amended the . . . agreement in 2008. But the defendants deny that they did so in bad faith or in breach of the . . . agreement.

"The defendants assert as special defenses that they complied with the terms of the . . . agreement generally and with § 3.4 in particular, and that they acted in good faith without gross negligence or wilful misconduct. Therefore, the defendants have assumed the burden of disproving those elements of the plaintiff's breach of contract claim by a preponderance of the evidence.

"Second, the plaintiff claims that the defendants also breached the duty of care provision by removing him as a member of CCP in 2013. [The plaintiff] claims that the defendants had no good faith basis for removing him and that they did so for the bad faith purpose of enriching themselves at his expense. The defendants do not dispute that they removed [the plaintiff] as a member of CCP, but they deny that they did so in bad faith or in breach of the . . . agreement. As with the 2008 amendment[s], the defendants assert as special defenses that they complied with the terms of the . . . agreement generally and with § 3.4 in particular, and that they acted in good faith without gross negligence or wilful misconduct. Therefore, the defendants have assumed the burden of disproving those elements of [the plaintiff's] breach of contract claim by a preponderance of the evidence.

Clinton *v.* Aspinwall

"Third, the plaintiff claims that the defendants also breached the duty of care provision by maintaining a $3 million capital reserve for CCP, which reduced by $750,000 the amount that [the plaintiff] was paid upon his removal. [The plaintiff] claims there was no good faith basis for a $3 million capital reserve at the time of his removal and that the defendants maintained the $3 million capital reserve at that time for the bad faith purpose of depriving [the plaintiff] of money.

"The defendants do not dispute that they maintained the $3 million capital reserve, but they deny they did so in bad faith or in breach of the . . . agreement. As with the other two aspects of [the plaintiff's] breach of contract claim, the defendants assert [as] special defenses that they complied with the terms of the . . . agreement generally and with § 3.4 in particular, and that they acted in good faith without gross negligence or wilful misconduct. Therefore, the defendants have assumed the burdens—the burden of disproving those elements of [the plaintiff's] breach of contract claim by a preponderance of the evidence.

"The defendants deny that they acted in bad faith, committed gross negligence or wilful misconduct. And they allege that they believe their action to be in CCP's best interest or not opposed to [it]. They also contend that their actions were authorized by the sections of the agreement [that] permitted amendment of the . . . agreement, removal of members, and retention of the capital reserve."

On the basis of our review of the jury instructions, we agree with the defendants that the trial court's charge improperly instructed the jury on the defendants' duties under the agreement. The court stated that "§ 3.4 requires the managers of CCP to exercise their best judgment in conducting the company's operations and in performing their other duties under the . . . agree-

Clinton *v.* Aspinwall

ment *and prohibits actions that are taken in bad faith or with gross negligence or wilful misconduct.*" (Emphasis added.) The court then proceeded to instruct the jury on each of the three bases for the plaintiff's breach of contract claim, stating that the plaintiff claimed that the defendants either had a "bad faith purpose" or "no good faith basis" for their actions. The good faith/bad faith references that permeated the court's charge, as well as the reference to the prohibition on actions taken with "gross negligence" or "wilful misconduct," come directly from the language of the exculpatory clause in § 3.4 of the agreement, which we have explained does not give rise to any contractual duties on the part of the defendants. This was error.

To compound the error, the trial court repeatedly instructed the jury that the defendants asserted as special defenses that they complied with the terms of the agreement generally, and with § 3.4 in particular, and that they acted in good faith without gross negligence or wilful misconduct. The court stated that the "defendants have *assumed the burden of disproving those elements* of the plaintiff's breach of contract claim by a preponderance of the evidence." (Emphasis added.) Not only does the court's instruction improperly suggest that acting in good faith, without gross negligence, or wilful misconduct are elements of the plaintiff's contract claim, it also put the burden on the defendants to disprove those so-called elements.[19]

_____

[19] We note that, consistent with the defendants' argument that the exculpatory provision of § 3.4 of the agreement does not create a duty but, rather, addresses liability if the jury concludes they breached the agreement, the defendants in their special defenses stated: (1) "the defendants bear no liability to the plaintiff because their actions were fully 'protected and justified' within the meaning of the second to last sentence of [§] 3.4 of the [agreement], including, without limitation, on the grounds that the defendants took action or refrained from taking action in good faith and in reliance [on] and in accordance with the opinion or advice as to matters of law of legal counsel selected by them with reasonable care," and (2) "[n]one of the defendants [is] liable to the plaintiff because each of the defendants acted in good faith in a manner each of them reasonably believed to be in,

Clinton *v.* Aspinwall

The issues of good faith and whether the defendants' conduct was grossly negligent or constituted wilful misconduct are not elements of the breach of contract claim and would arise only after the trier of fact had determined that there was a breach in the first place. As we previously explained, when an entity's operating agreement contains an exculpatory provision like the one in this case, the trier of fact must first determine whether there was a breach of an independent legal duty before the exculpatory provision becomes operative. See, e.g., *Gatz Properties, LLC* v. *Auriga Capital Corp.*, supra, 59 A.3d 1216–18; *Metro Storage International, LLC* v. *Harron*, supra, 275 A.3d 847; *Wenske* v. *Blue Bell Creameries, Inc.*, Docket C.A. No. 2017-0699-JRS, 2018 WL 3337531, *20–21 (Del. Ch. July 6, 2018). After finding a breach, the trier of fact then considers whether the defendant is nevertheless not liable for damages under the exculpatory clause. See *Gatz Properties, LLC* v. *Auriga Capital Corp.*, supra, 1216–18; *Metro Storage International, LLC* v. *Harron*, supra, 847; *Wenske* v. *Blue Bell Creameries, Inc.*, supra, *20–21.

In the present case, if the jury had found a breach of the agreement (under some provision other than the second sentence of § 3.4), the jury would then have had to determine whether the defendants were liable for damages under the exculpatory clause of § 3.4. If the jury had found that, notwithstanding the breach, the defendants had acted in good faith and in a manner the defendants reasonably believed to be in, or not opposed to, the best interests of CCP, and that their course of conduct did not constitute gross negligence or wilful

_____

or not opposed to, the best interests of CCP, and their actions did not constitute gross negligence or wilful misconduct." The defendants made clear that they were asserting their special defenses "[w]ithout waiving the requirement that the plaintiff bear the burden of proof and persuasion on all elements of his claim . . . ."

Clinton *v.* Aspinwall

misconduct, the plaintiff would not be entitled to any recovery for the breach. If, however, the jury had found that the defendants' actions that constituted the breach of contract were in bad faith and that the defendants could not have reasonably believed that their actions were in, or not opposed to, the best interests of CCP, or that their conduct constituted gross negligence or wilful misconduct, the defendants would be liable for damages for the breach. The trier of fact would then go on to consider the amount of damages to be awarded.

Although it is clear that the trial court erred in instructing the jury on the meaning of § 3.4 of the agreement and the duties of the defendants thereunder, the court's error with respect to the meaning of § 3.4 was further exacerbated by its related instruction to the jury about the jury's role in interpreting the provisions of the parties' agreement. The defendants had argued before the trial court that it should have undertaken a pretrial analysis of the pertinent provisions in the agreement to determine whether they were clear and unambiguous and, if so, that it should have precluded the plaintiff from introducing any parol evidence to vary the terms of the agreement, and also should have concluded, as a matter of law, that § 3.4 did not create any separate legal duties. The court declined to undertake that analysis. A review of the jury instructions reveals that the court, instead, improperly put the onus on the jury to determine whether the contract provisions at issue were ambiguous and, therefore, whether to consider extrinsic evidence to discern the meaning of those provisions.

The court's instruction provided that, "[t]o be enforceable, an agreement must be definite and certain as to its essential terms and requirements. In interpreting a contract, the objective is to determine the intent of the parties from the language of the contract. This inquiry should focus on the parties shared expectation at the

352 Conn. 597 JULY, 2025 619

Clinton *v.* Aspinwall

time they contracted. The contract's construction should be that . . . which would be understood by an objective, reasonable third party. *If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties to vary the terms of the contract or to create an ambiguity.* The first place to look to find the party's intent is the wording that was used in the contract. Words in a contract are to be given their ordinary meaning. *If you cannot determine what was intended from the language, you may consider the circumstances surrounding the entering into the contract. To determine the intent of the parties, you may interpret the contract language in light of the situation of the parties and the circumstances surrounding the making of the contract.* You also may consider the motives of the parties and the ends that they sought to accomplish by their contract.'' (Emphasis added.)

Instead of instructing the jury to decide whether the pertinent provisions were ambiguous and to consider extrinsic evidence only if they were, the trial court should have undertaken its own independent pretrial analysis of the operative provisions as a threshold matter because the question of whether a contract provision is ambiguous is a question of law and, therefore, a question that must be decided by the trial court, not the jury. See, e.g., *Sunline Commercial Carriers, Inc.* v. *CITGO Petroleum Corp.*, supra, 206 A.3d 847 n.68 (''whether a contract is unambiguous is a question of law''); see also *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101–102, 84 A.3d 828 (2014) (under Connecticut law, ''the determination as to whether contractual language is plain and unambiguous is itself a question of law''). If a provision is unambiguous, extrinsic evidence that varies or contradicts the terms of that provision would be inadmissible. If the court determined that it was ambiguous, only then could extrinsic evidence be

Clinton *v.* Aspinwall

admitted to help the jury determine the intent of the parties with respect to that provision. As we explained, no such analysis was undertaken by the trial court in the present case.[20] Rather, by delegating that function to the jury, the trial court directed the jurors not only to decide whether the relevant provisions of the agreement were ambiguous but also only then to consider evidence that the court had admitted as full exhibits during the trial.

With respect to the provisions of the agreement that were clear and unambiguous, it was the trial court's duty to instruct the jury as to the correct interpretation of those provisions. See, e.g., *Worth Steel Co.* v. *Lewis*, 32 Del. 286, 288, 122 A. 446 (1923) ("[u]nquestionably it was the duty of the court to construe the contract, and instruct the jury as to its meaning"); cf. *Libero* v. *Lumbermens Mutual Casualty Co.*, 143 Conn. 269, 274, 121 A.2d 622 (1956) ("[i]t is the court's duty, at least when the interpretation of a contract does not depend on facts extrinsic to the contract, to construe the provisions of any contract [that] is in suit and instruct the jury as to the correct interpretation"). With respect to any provision that it concluded was ambiguous, the court was obligated to instruct the jury that the provision *was* ambiguous, as opposed to letting the jury decide *whether* it was ambiguous, and to explain the jury's task in resolving that ambiguity. See, e.g., *GMG Capital Investments, LLC* v. *Athenian Venture Partners I, L.P.*, supra, 36 A.3d 783 ("where reasonable minds could differ as to the contract's meaning, a fac-

_____

[20] The defendants argued in a motion in limine that the trial court was required to undertake this analysis. The trial court denied the motion, concluding that the defendants' arguments were "previously the subject of other decisions in this case by other judges" and that "[t]he motion in limine, in essence, [sought] reargument as to certain aspects of those decisions." Our review of the trial court's earlier decisions, however, reveal that no such analysis had previously been undertaken by other judges, and, therefore, the court should have undertaken that analysis.

Clinton *v.* Aspinwall

tual dispute results and the [fact finder] must consider admissible extrinsic evidence'').

Although not all instructional errors are harmful, we conclude that the errors in the present case were. See, e.g., *Kos* v. *Lawrence + Memorial Hospital*, 334 Conn. 823, 845, 225 A.3d 261 (2020) (setting forth considerations for determining whether instructional errors are harmful and explaining that before ''party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful'' (internal quotation marks omitted)). The court's jury instructions improperly allowed the jury to find the defendants liable to the plaintiff for breaches of duties (i.e., acting in bad faith or with gross negligence or wilful misconduct) that the defendants did not owe to the plaintiff under § 3.4 of the agreement. The court's instructions also improperly imposed on the defendants the burden of disproving those three specifications of duties, which the court misdescribed as elements of the plaintiff's breach of contract claim. Last, the trial court allowed the jury to decide whether the relevant provisions of the agreement were ambiguous and whether to consider extrinsic evidence that the court admitted, which likely was influential in producing a verdict for the plaintiff.

The plaintiff contends that, even if the trial court improperly instructed the jury that the defendants had a duty to act in good faith under § 3.4 of the agreement, any error was harmless. According to the plaintiff, the defendants' duty to ''exercise their best judgment in conducting the Company's operations and in performing their other duties [under the agreement]'' in § 3.4 is synonymous with or encompasses a duty to act in good faith. Any error in the jury instructions, he argues, was harmless because one cannot exercise his best judgment while acting in bad faith (i.e., in the absence of good faith). The defendants do not dispute that the first sentence of § 3.4 imposes on them a duty to exercise

Clinton *v.* Aspinwall

"their best judgment" but disagree that the phrase is synonymous with or encompasses a duty to act in good faith. They argue that a requirement to exercise "their best judgment" in a Delaware business context has a plain language meaning, requiring corporate fiduciaries to exercise their independent judgment and prohibiting agreements or delegations that would avoid or obviate each fiduciary's individual responsibility to exercise his own judgment. They contend that this understanding was "clearly articulated nearly seventy years ago" in *Abercrombie* v. *Davies*, 35 Del. Ch. 599, 610–11, 123 A.2d 893 (1956), rev'd on other grounds, 36 Del. Ch. 371, 130 A.2d 338 (1957), and has remained good law to this day. See, e.g., *Toedtman* v. *TurnPoint Medical Devices, Inc.*, Docket C.A. No. N17C-08-210 RRC, 2019 WL 328559, *9 (Del. Super. January 23, 2019). Notably, neither the plaintiff nor the defendants ever submitted proposed jury instructions to the court that defined or explained how the phrase applies to the parties' conduct, and their responses about the meaning of that phrase during oral arguments before this court were equivocal at best. The trial court also did not define or explain the phrase for the jury.

On the basis of our examination of the phrase "their best judgment" in the context of the first sentence of § 3.4 of the agreement, we cannot conclude that the provision is unambiguous, as it is "fairly susceptible [to] different interpretations or may have two or more different meanings." (Internal quotation marks omitted.) *GMG Capital Investments, LLC* v. *Athenian Venture Partners I, L.P.*, supra, 36 A.3d 780. To be sure, on the basis of the plain meaning of the terms "best" and "judgment," the phrase could mean that managers must exercise a high degree of consideration and deliberation in conducting CCP's operations and in performing their other duties under the agreement. See The American Heritage College Dictionary (4th Ed. 2007) pp. 135, 750 ("best"

Clinton *v.* Aspinwall

means "[t]o the greatest degree or extent," and "judgment" means "[a]n opinion or estimate formed after consideration or deliberation, [especially] a formal or authoritative decision"). On the other hand, as the defendants point out, the phrase "their best judgment" could plausibly mean that the phrase simply requires that managers exercise independent judgment and prohibits delegations that would otherwise curtail their exercise of discretion. This interpretation is particularly plausible given a long line of Delaware case law in which Delaware courts have considered challenges to contractual governance arrangements premised on allegedly improper delegations of board authority under § 141 (a) of title 8 of the Delaware Code.[21] See, e.g., *West Palm Beach Firefighters' Pension Fund* v. *Moelis & Co.*, 311 A.3d 809, 818 (Del. Ch. 2024) ("[u]nder Chancellor Seitz's seminal decision in [*Abercrombie*], governance restrictions violate [§] 141 (a) [of title 8 of the Delaware Code] when they have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters or tend . . . to limit in a substantial way the freedom of director decisions on matters of management policy" (internal quotation marks omitted)). Significantly, the plaintiff has not persuaded us that the phrase "their best judgment" in § 3.4 is synonymous with or encompasses a duty to act in good faith, as he contends.[22]

---

[21] Section 141 (a) of title 8 of the Delaware Code provides: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation." Del. Code Ann. tit. 8, § 141 (a) (2011).

[22] Although the plaintiff points to a few Delaware cases to suggest that the definition of "best judgment" under § 3.4 of the agreement reasonably could encompass a duty to act in good faith, none is persuasive. For example, he directs this court to *University of Delaware* v. *Warrington*, Docket Civ. A. No. 12440, 1993 WL 410417 (Del. Ch. October 6, 1993), a case involving

Clinton *v.* Aspinwall

Because the provision is ambiguous, its meaning becomes a question of fact for the jury. On remand, the trial court should instruct the jury that the provision is ambiguous and as to its proper role in construing ambiguous contractual provisions, including that it may consider extrinsic evidence to discern the meaning of the provision. See, e.g., *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, supra, 36 A.3d 783–84.

Under these circumstances, we cannot say that the trial court's instructions fairly presented the plaintiff's breach of contract claim to the jury in such a way that injustice was not done to the defendants. We therefore conclude that the judgment of the trial court must be reversed and the case must be remanded for a new trial. It follows that the trial court's awards of counsel fees, costs, and interest to the plaintiff, which were based on the underlying erroneous judgment of the trial court, must be vacated.

## III

The defendants also claim that the trial court improperly admitted the testimony of the plaintiff's expert witness, Kenneth Pia, a certified public accountant, about the propriety of the capital reserve pursuant to § 7-2 of the Connecticut Code of Evidence.[23] We disagree.

---

whether the University of Delaware invoked the cy pres doctrine in bad faith and whether it was required to pay attorney's fees. Id., *3. In declining to award any attorney's fees, the Court of Chancery explained that the "[u]niversity perhaps did not use its *best judgment* when it determined that the doctrines of cy pres and deviation might be available to it in this situation . . . [but] the [u]niversity's poor decision in this matter does not rise to the level of *bad faith* or vexatiousness." (Emphasis added.) Id. The plaintiff's reliance on *University of Delaware* is misplaced, as that case did not involve a contract dispute in which the court was required to determine the intent of the parties from the specific language in the agreement, and the court did not purport to set out definitive meanings of the terms "best judgment" or "bad faith" (i.e., the absence of good faith).

[23] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning

Clinton *v.* Aspinwall

The following additional facts and procedural history are relevant to the defendants' claim. Before trial, the defendants filed a motion in limine seeking to preclude the admission of Pia's anticipated testimony regarding CCP's $3 million capital reserve. The defendants argued that Pia's deposition testimony revealed that he did not have an adequate basis to opine on the need for CCP's capital reserve, and, therefore, his testimony was irrelevant, unhelpful to the trier of fact, and, even if his testimony was relevant and had some probative value, that value was substantially outweighed by the likelihood that the testimony would waste time, as well as cause prejudice and confuse and mislead the jury.

In his opposition to the motion in limine, the plaintiff argued that Pia's testimony, particularly with respect to his knowledge of accounting, would assist the trier of fact in several ways. The court heard oral arguments on the defendants' motion prior to trial, reserved its ruling, and later denied the motion on the first day of trial. The court stated that the defendants had not shown that Pia's expert testimony was inadmissible under § 7-2 of the Connecticut Code of Evidence. In the court's opinion, Pia's anticipated testimony appeared to satisfy the three requirements of § 7-2, and the defendants' arguments went more to the weight of the evidence than to its admissibility.

A trial court's decision to admit expert testimony is reviewed for an abuse of discretion. E.g., *Fleming* v. *Dionisio*, 317 Conn. 498, 505, 119 A.3d 531 (2015). Trial courts are afforded "wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on 'untenable grounds' . . . or involves 'a clear misconception of the

scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

Clinton *v.* Aspinwall

law,' we will not disturb its decision." (Citation omitted.) *Weaver* v. *McKnight*, 313 Conn. 393, 405, 97 A.3d 920 (2014). Pursuant to Connecticut Code of Evidence § 7-2, expert testimony is generally admissible if "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Bruny*, 342 Conn. 169, 187, 269 A.3d 38 (2022). We have explained that expert testimony is not required in every case, but it "may be helpful [to the trier of fact] in many instances . . . ." (Internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 700, 138 A.3d 868 (2016).

Pia was offered as an expert in the areas of general accounting, financial analysis, and forensic damage analysis, which were areas of special skill or knowledge directly related to the issues in the case. Pia testified that he had performed financial analyses of and appraised closely held companies for over thirty years and had rendered hundreds of opinions on issues related to reserves. He estimated that he has testified as an expert 200 times. Pia also testified about the purpose of capital reserves in general, a subject that is not common knowledge to the average person, and indicated that the creation of the capital reserve at issue in the present case was permitted under the § 3.2 (a) (xiii) of the agreement, which provides in relevant part that the managers have the power to "establish from time to time a capital reserve for future expenses of the Company." Although he had never previously analyzed a reserve based on the exact contractual language at issue in the parties' agreement or seen a capital reserve used in a formula to determine a payout to a terminated member, he indicated that he has rendered opinions in adversarial pro-

Clinton *v.* Aspinwall

ceedings regarding issues relating to reserves in hundreds of cases.

Pia opined that CCP did not need a $3 million capital reserve in 2013 at the time of the plaintiff's termination on the basis of his review of the purpose of the reserve under the agreement and a review of financial records reflecting CCP's balance sheet assets, liabilities, and equity. He testified that one must understand the financial position of the enterprise to see if all or some of that money needs to be set aside for the future expenses of the entity. Pia acknowledged that this opinion was not based on any established industry standards, such as accounting standards that govern the preparation for financial statements or business valuations, and that he was not rendering an opinion on the valuation of an asset or offering an opinion on whether the defendants breached the agreement under any standard of care, including gross negligence, recklessness, or bad faith. Rather, his testimony focused primarily on his opinion of whether, based on his experience and a review of voluminous financial records, a $3 million capital reserve for future expenses was needed in 2013 at the time of the plaintiff's termination.

The defendants contend on appeal that Pia's testimony should have been precluded because it was not based on a particular formula or standard of care. Before the trial court, the defendants' counsel objected to Pia's testimony about capital reserves on the basis of Pia's qualifications. According to the defendants' counsel, Pia had no basis to render an opinion under the agreement or under any other standard of care. This claim, whether described as an objection to Pia's qualifications or to his failure to base the opinion on a particular standard of care, is without merit. Although the defendants direct us to a case in the medical malpractice context to suggest that Pia was required to identify a particular standard of care for determining the need

Clinton *v.* Aspinwall

for CCP's capital reserve, their reliance on that case is misplaced. See, e.g., *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 567, 864 A.2d 1 (2005) (explaining that plaintiffs in medical malpractice cases must generally present expert testimony to establish requisite standard of care because requirements for proper medical diagnosis and treatment are not within common knowledge of laypersons). The establishment and purpose for the capital reserve at issue in this case is not based on a professionally recognized standard of care but dictated by the terms of the parties' agreement. Although the defendants attempt to paint Pia's opinion as being wholly untethered from the parties' agreement, that contention is belied by the record. Pia appropriately relied on the agreement to ascertain the purpose of the capital reserve. On the basis of his training, experience, and a review of various financial records, he then opined that, in light of its purpose, a $3 million reserve was not needed in February, 2013. We are not aware of any authority—and the defendants have not directed us to any—that required Pia to have identified a particular formula or standard of care in this contractual context in order for his testimony to be admitted pursuant to § 7-2 of the Code of Evidence. On the facts of this case, we conclude that the trial court did not abuse its discretion in admitting Pia's testimony about the capital reserve under § 7-2.

The judgment is reversed and the case is remanded for a new trial; the trial court's awards of attorney's fees, costs, and interest to the plaintiff are vacated.

In this opinion the other justices concurred.

McDONALD, J., concurring. I agree with and join the majority's well reasoned opinion. Specifically, I agree that the jury was improperly instructed that the second sentence of § 3.4 of the operating agreement of CCP

Clinton *v.* Aspinwall

Equity Partners, LLC, a Delaware limited liability company (LLC), imposes a duty on managers not to act in bad faith or with gross negligence or wilful misconduct because, under settled Delaware law, this sort of exculpatory provision does not impose affirmative duties on the parties.[1] I further agree that a retrial is warranted because the first sentence of § 3.4 *does* impose affirmative duties on the managers (to "exercise their best judgment" in conducting CCP's operations and performing their contractual obligations), and the "best judgment" requirement, although ambiguous, reasonably could be construed—either independently or in context—to prohibit the sort of oppression of minority interests that the plaintiff, John B. Clinton, alleged and that the jury apparently found.[2] I write separately to emphasize two points.

I

First, because the operating agreement is not governed by Connecticut law, the majority's resolution of the contract issues does not establish any precedent under the laws of Connecticut regarding the interpreta-

---

[1] See, e.g., *Feeley* v. *NHAOCG, LLC*, 62 A.3d 649, 664–65 (Del. Ch. 2012) (similar limiting language in exculpatory clause is addressed to fiduciary duties, which are assumed to exist independently of written contract).

[2] I agree with the plaintiff that a plain language reading of the term "best judgment," as those words typically are defined, is consistent with the conclusion that members of an LLC fail to exercise their best judgment when they establish an unnecessarily and unreasonably large capital reserve, expel a minority shareholder, and then almost immediately begin to dissipate the capital reserve by distributing to themselves that shareholder's accrued earnings, resulting in an anticipated and costly legal battle. I also agree with the plaintiff that, although "best judgment" does not appear to be a settled term of art under Delaware law, some courts have used that term in a manner that implies that, by acting in bad faith, one necessarily fails to exercise his or her best judgment. See, e.g., *University of Delaware* v. *Warrington*, Docket Civ. A. No. 12440, 1993 WL 410417, *3 (Del. Ch. October 6, 1993); *Dunning* v. *Barnes*, Docket No. Civ. A. 98C-02-045, 2002 WL 31814525, *1 n.1 (Del. Super. November 4, 2002); see also, e.g., *Hernandez* v. *Employers Mutual Liability Ins. Co. of Wisconsin*, 346 F.2d 154, 155 (5th Cir. 1965).

Clinton *v.* Aspinwall

tion or application of LLC operating agreements, and nothing in the majority opinion should be interpreted to do so. There is no disagreement, at this point, that the relationship between the parties, both contractual and fiduciary, is governed by the law of Delaware. That state's corporate governance law features "distinctive substantive and structural attributes . . . ." J. Fisch, "Leave It to Delaware: Why Congress Should Stay Out of Corporate Governance," 37 Del. J. Corp. L. 731, 740 (2013). For example, it is the stated policy of the Delaware legislature "to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." Del. Code Ann. tit. 6, § 18-1101 (b) (2005). One corollary of this is that the Delaware courts often dismiss at the pleading stage claims alleging breach of fiduciary duty when those claims overlap completely with claims alleging breach of a corporate governance agreement. That may well be why the trial court in this case did not permit the jury to find, in the alternative, that the defendants, Michael E. Aspinwall, Steven F. Piaker, and David W. Young, breached their duty of loyalty to the plaintiff.[3]

---

[3] To be clear, I do not understand Delaware law to have required the jury verdict form to be structured as it was under the facts of this case.

Substantively, the trial court presumably was relying on a line of Delaware cases holding that a breach of contract claim cannot be bootstrapped onto a breach of fiduciary duty claim when the two claims are substantially identical and the obligation is expressly addressed by the contract. See, e.g., *Nemec* v. *Shrader*, 991 A.2d 1120, 1129 (Del. 2010) ("It is a [well settled] principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous."). The Delaware Supreme Court has made clear, however, that this bootstrapping rule does not preclude a plaintiff from bringing a breach of fiduciary duty claim that overlaps with a contract claim but relies on additional factual allegations, implicates distinct legal principles, or affords different remedies. As that court recently explained in *Bäcker* v. *Palisades Growth Capital II*, *L.P.*, 246 A.3d 81 (Del. 2021), "[t]his bootstrapping case law only requires dismissal where a fiduciary duty claim wholly overlaps with a concurrent breach of contract claim." Id., 109. It does not apply, the court explained, when the two claims share a common nucleus of operative

Clinton *v.* Aspinwall

Accordingly, our conclusions in this case should not be taken to mean that the result necessarily would have been the same had the matter been litigated under Connecticut law.

II

Second, I would accept the plaintiff's request in his preliminary statement of the issues that we address his challenge to the trial court's ruling striking his claim alleging that the defendants had breached the implied covenant of good faith and fair dealing (implied covenant). The following procedural history is relevant.

In his first amended complaint, the plaintiff alleged that each of the defendants had violated the implied covenant under Delaware's statutory[4] and common law. Specifically, he alleged that § 10.3 (b) of the operating

---

facts, but the fiduciary duty claim depends on additional facts and considerations, or provides for different remedies. See id. That is true of the present case, in which the plaintiff's breach of fiduciary duty claim involved, at the very least, distinct factual allegations and legal theories (e.g., that the defendants failed to deal with the plaintiff in good faith with respect to extracontractual representations, and that they sought to advantage themselves at his expense).

Procedurally, in Delaware, cases of this sort are not typically tried to a jury, so the verdict form issue simply does not arise. As a matter of Connecticut procedural law, I see no reason why the jury could not have been permitted to find, in the alternative, that the plaintiff had established every element of a breach of fiduciary duty claim. See *Clinton* v. *Aspinwall*, 344 Conn. 696, 711, 281 A.3d 1174 (2022) ("under Delaware law, breach of fiduciary duty is a legally consistent alternative theory of recovery to breach of contract"). Of course, the plaintiff could not recover the same damages under distinct legal theories.

As it was, though, because no judgment was rendered on the breach of fiduciary duty claim, the plaintiff was required to withdraw that claim in order to permit the present appeal to proceed. See id., 711 n.7. I see no reason why, on remand, he cannot seek the trial court's leave to amend his complaint and to reinstate that claim, on which the jury should be permitted to reach a verdict, regardless of how it resolves the contract claim.

[4] See Del. Code Ann. tit. 6, § 18-1101 (c) (2005) (LLC agreement may not eliminate implied covenant).

Clinton *v.* Aspinwall

agreement,[5] which deals with the repurchase of member interests, includes an implied contractual obligation not to maintain an unreasonably large company capital reserve at the time of a member's repurchase event. The plaintiff further alleged that the $3 million reserve that the defendants maintained when they removed him from the company was unreasonably large.

The defendants moved to strike the implied covenant claim, contending that the claim was not cognizable under Delaware law because, among other things, the purported obligation not to maintain an unreasonably large capital reserve was inconsistent with what they understood to be the "virtually unfettered discretion" afforded to them under the operating agreement.[6] (Internal quotation marks omitted.) The trial court, *Peck, J.*, granted the motion to strike the implied covenant claim, concluding that the plaintiff's allegations were legally insufficient under Delaware law. Specifically, the court concluded that the alleged reasonableness requirement was not "clearly implied" by the express terms of the operating agreement because § 10.3 (b) "makes a mere reference to the capital reserve" and does not address its reasonableness.

The plaintiff took the initial steps necessary to challenge this ruling on appeal. When the defendants brought their appeals in 2018, the plaintiff filed his own preliminary statement of issues. Pursuant to Practice Book

---

[5] Section 10.3 (b) of the operating agreement provides in relevant part: "Upon any repurchase . . . [the] Repurchase Member . . . shall receive . . . an amount equal to the aggregate amount in the Capital Account of such Repurchase Member . . . less such Repurchase Member's pro rata share . . . of the then-current capital reserve for future expenses established by the Board of Managers."

[6] Section 3.2 (a) (xiii) of the operating agreement provides that managers shall have the power to "establish from time to time a capital reserve for future expenses of the Company."

Clinton *v.* Aspinwall

(2019) § 63-4 (a) (1) (B),[7] he requested that, in the event that the defendants were awarded a new trial, the following adverse rulings of the Superior Court (among others) be considered on appeal:

"1. Whether the Superior Court erred in striking [the plaintiff's] claim for breach of the implied covenant . . . .

"2. Whether the Superior Court erred in striking [the plaintiff's Connecticut Unfair Trade Practices Act (CUTPA)] claim."

Following the dismissal of the defendants' original appeals; see *Clinton* v. *Aspinwall*, 344 Conn. 696, 699, 713, 281 A.3d 1174 (2022); and the plaintiff's withdrawal of his fiduciary duty claim, which allowed this appeal to proceed, the plaintiff again presented for this court's review, under Practice Book (2024) § 63-4 (a) (1) (B), the issue of whether the trial court properly struck his implied covenant and CUTPA claims. Although the plaintiff briefed both issues before the trial court, he has not addressed them in his briefs submitted to the Appellate Court or this court.

There is no question that, before we could consider the plaintiff's implied covenant claim, we would need to afford the parties a new opportunity to brief the issue. See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014). I would have requested supplemental briefing because I think the plaintiff plau-

___

[7] Practice Book (2019) § 63-4 (a) (1) provides in relevant part: "If any appellee wishes to . . . (B) present for review adverse rulings or decisions of the [trial] court which should be considered on appeal in the event the appellant is awarded a new trial . . . that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues.

"Whenever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue."

Clinton *v.* Aspinwall

sibly argues that his implied covenant claim was colorable under Delaware law and should not have been stricken, and because judicial economy favors resolving the issue at this time rather than after a second trial.[8]

Courts and commentators have observed that Delaware's courts have provided uncharacteristically opaque guidance with respect to the implied covenant.[9] The boilerplate language typically emphasizes the cautiousness with which Delaware courts approach such claims, given their disinclination to imply contract terms to which the parties did not formally agree or to "rebalanc[e] economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." (Internal quotation marks omitted.) *Gerber* v. *Enterprise Products Holdings, LLC*, 67 A.3d 400, 421 (Del. 2013), overruled on other grounds by *Winshall* v. *Viacom International, Inc.*, 76 A.3d 808 (Del. 2013). Despite the cautions, however, plaintiffs regularly prevail on implied covenant claims in Delaware. See, e.g., B. Horton, "Modifying Fiduciary Duties

---

[8] Although I would have no objection to it, I see no need to solicit supplemental briefing on the plaintiff's CUTPA claim, which, for various reasons, I believe was correctly stricken.

[9] See, e.g., *E.I. DuPont de Nemours & Co.* v. *Pressman*, 679 A.2d 436, 443 (Del. 1996) ("[a]lthough the [implied] [c]ovenant is a generally acknowledged principle, its precise contours are not fixed"); D. Listwa, "Cooperative Covenants: Good Faith for the Alternative Entity," 24 Stan. J.L. Bus. & Fin. 137, 137 (2019) ("[l]acking a clear notion of what the implied covenant demands, the Delaware courts have been hobbled in their attempts to generate a standard commensurate with the much-praised set of precedents the jurisdiction has developed with regard to corporate fiduciary duties"); D. Listwa, supra, 141 ("the Delaware Supreme Court has struggled to develop a workable [implied covenant] doctrine"); M. Manesh, "Express Contract Terms and the Implied Contractual Covenant of Delaware Law," 38 Del. J. Corp. L. 1, 1 (2013) ("Delaware law conceives of the implied . . . covenant . . . in contradictory terms. It is both a [gap-filler] subject to the express terms of a contract and an overriding obligation notwithstanding the express terms of a contract. It is not a judicial license to equitably rewrite bargained for agreements, yet courts may invoke [it] to limit express contractual rights when fairness dictates.").

Clinton *v.* Aspinwall

in Delaware: Observing Ten Years of Decisional Law,''
40 Del. J. Corp. L. 921, 921 (2016) (''despite the [Dela-
ware] Court of Chancery's recurring admonition that
the implied covenant is not a replacement for fiduciary
duties, the implied covenant remains a potent attack
where the [LLC] agreement partially modifies fiduciary
duties, leaving discretionary gaps'').

The trial court concluded that the plaintiff's implied
covenant claim must be stricken because the alleged
contractual obligation was not ''clearly implied'' by the
express terms of the operating agreement. The primary
source that the trial court relied on in imposing that
requirement was *Liberty Property Ltd. Partnership* v.
*25 Massachusetts Avenue Property LLC*, Docket C.A.
No. 3027-VCS, 2009 WL 224904 (Del. Ch. January 22,
2009), aff'd, 970 A.2d 258 (Del. 2009) (*Liberty Property*).
But that unpublished case was decided under the law of
the District of Columbia, not of Delaware. See id., *4–5.

In the ''foundational'' case on the matter; D. Listwa,
''Cooperative Covenants: Good Faith for the Alternative
Entity,'' 24 Stan. J.L. Bus. & Fin. 137, 141 (2019); the
Delaware Supreme Court embraced what it referred to
as a ''commonsensical'' approach to implied covenant
claims. (Internal quotation marks omitted.) *Gerber* v.
*Enterprise Products Holdings, LLC*, supra, 67 A.3d 418.
Under *Gerber*, which was decided subsequent to all of
the Delaware cases on which the trial court relied in
its decision addressing the defendants' motion to strike,
the implied covenant is used to enforce the parties'
contractual bargain by implying those terms that the
parties would have agreed to during their original nego-
tiations. Id. ''Under Delaware law, a court confronting
an implied covenant claim asks whether it is clear from
what was expressly agreed [on] that the parties who
negotiated the express terms of the contract would
have agreed to proscribe the act later complained of
as a breach of the implied covenant of good faith—had

Clinton *v.* Aspinwall

they thought to negotiate with respect to that matter. . . . [Fair dealing means] a commitment to deal fairly in the sense of consistently with the terms of the parties' agreement and its purpose. Likewise good faith does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract." (Emphasis omitted; internal quotation marks omitted.) Id., 418–19. Put differently, "[Delaware law suggests that] there are two strains of the implied covenant: (1) gap-filling and (2) protecting against arbitrary and bad faith exercise of discretion. Under the first strain, the implied covenant is implicated when an agreement is *truly silent* on a term and requires a party to identify a gap in the contract to state a claim. Under the second strain, the implied covenant is implicated when a party is given discretion to act as to a certain subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms." (Emphasis added; footnotes omitted; internal quotation marks omitted.) *Osios LLC* v. *Tiptree, Inc.*, Docket C.A. No. 2023-0589-NAC, 2024 WL 2947854, *5 (Del. Ch. June 12, 2024). The *Liberty Property* standard, as applied by the trial court, thus captures only a subset of those claims that are cognizable under the current Delaware rule, which recognizes that the implied covenant extends to questions on which the contractual language is silent.[10]

---

[10] A primary purpose of the implied covenant is to fill gaps in the express terms of the contract that the parties either (1) never thought to address or (2) considered so obvious as to not require discussion. See, e.g., *Cygnus Opportunity Fund, LLC* v. *Washington Prime Group, LLC*, 302 A.3d 430, 458–59 (Del. Ch. 2023). But, by definition, few, if any, such gaps will be *clearly* implied by the text of an LLC agreement, at least in the way that the trial court appears to have understood and applied that standard. See, e.g., id., 461 ("The defendants [argue] that the LLC [a]greement does not impose any express limitations on [their discretion], but the answer to that is, '[p]recisely.' The absence of any express limitation is what creates a gap in the [provision]. The LLC [a]greement provides the [board of managers] with discretion over which path to take, and the implied covenant requires that the [b]oard exercise that discretion reasonably."). The standard that the trial court adopted would make it almost impossible for a plaintiff to

Clinton *v.* Aspinwall

I believe that the Delaware courts would have allowed the plaintiff's implied covenant claim to proceed under either strain of the implied covenant, insofar as he alleged both that the defendants had violated implied contractual provisions to which rational actors would have agreed and that the defendants had performed their discretionary management functions arbitrarily and in bad faith.[11] It makes sense that the parties would have agreed at the original bargaining stage to afford majority shareholders broad discretion to establish a suitable cash reserve and equally broad discretion to remove a minority shareholder with whom they could no longer constructively operate. That sort of self-interest is assumed and permitted under Delaware law. But no rational agent would agree in advance to an arrangement whereby, if he happened to fall into the minority at any point, the majority could transfer all of his accrued profits into an unnecessarily large capital reserve, remove him from the company, and then redistribute his share of the profits to themselves.[12] Interpreting the operating agreement in that manner would give rise to a sort of prisoner's dilemma scenario, in which each group of members would be incentivized to dispossess a tran-

_____

prevail on an implied covenant claim. Of course, under *Gerber*, for the plaintiff to prevail, it still must be clear that the parties to the operating agreement, had they considered the issue during the contract drafting process, would have agreed to prohibit the challenged conduct.

[11] In his opposition to the motion to strike, the plaintiff repeatedly cited *Gerber* as providing the governing standard and explained, at some length, how his allegations were consistent with both strains of Delaware implied covenant law.

[12] See, e.g., *ArchKey Intermediate Holdings Inc.* v. *Mona*, 302 A.3d 975, 1005 (Del. Ch. 2023) ("[Although] they obviously are not fiduciaries and are free to act in their own interests, [the parties] have committed themselves to an effort to create joint surplus. For purposes of the implied covenant, that means that in the original bargaining position, the parties would have viewed a promise not to harm each other intentionally as so obvious that neither side would have raised it."). The extent to which the defendants engaged in that sort of improper conduct is, of course, a question of fact for the jury.

Clinton *v.* Aspinwall

sient minority, before they themselves were dispossessed. Delaware courts repeatedly have rejected the argument, raised by the defendants in this case, that a contractual grant of managerial discretion should be read so broadly as to allow that degree of self-dealing, which deprives the oppressed minority member of the benefit of the bargain; rather, such conduct is insulated from challenge only if it is plainly *permitted* by the language of the contract.[13]

We can certainly defer action on this issue, but I fail to see the wisdom in that approach. On remand, the plaintiff may seek to have his implied covenant claim reconsidered by a different trial court, and reinstated. In light of the authorities identified herein, perhaps that trial court will allow the claim to proceed. Either way, years from now, we face the potential of yet another appeal, another reversal, another retrial. The plaintiff alone has now spent more than $1.2 million in attorney's fees litigating a $1.1 million judgment. The underlying conduct took place in 2013. The case was tried in 2018. This court, in 2022, directed that the defendants' initial appeals be dismissed; see *Clinton* v. *Aspinwall*, supra, 344 Conn. 699, 713; and now, in 2025, we are sending it back so that the parties and the trial court can start all over again. Accordingly, rather than prolong and make more complicated a dispute that should have been resolved years ago, I would afford the parties an

---

[13] Cf., e.g., *Dieckman* v. *Regency GP LP*, 155 A.3d 358, 367–69 (Del. 2017); *Dunlap* v. *State Farm Fire & Casualty Co.*, 878 A.2d 434, 440 (Del. 2005); *Cygnus Opportunity Fund, LLC* v. *Washington Prime Group, LLC*, 302 A.3d 430, 458–61 (Del. Ch. 2023); *Bandera Master Fund LP* v. *Boardwalk Pipeline Partners, LP*, Docket C.A. No. 2018-0372-JTL, 2019 WL 4927053, *21–24 (Del. Ch. October 7, 2019); *Bay Center Apartments Owner, LLC* v. *Emery Bay PKI, LLC*, Docket C.A. No. 3658-VCS, 2009 WL 1124451, *7 (Del. Ch. April 20, 2009); *Amirsaleh* v. *Board of Trade of the City of New York, Inc.*, Docket Civil Action No. 2822-CC, 2008 WL 4182998, *1, *7–9 (Del. Ch. September 11, 2008); *Charlotte Broadcasting, LLC* v. *Davis Broadcasting of Atlanta, L.L.C.*, Docket C.A. No. 13C-04-143-WCC CCLD, 2015 WL 3863245, *6–8 (Del. Super. June 10, 2015), aff'd, 134 A.3d 759 (Del. 2016).

opportunity to brief the implied covenant claim and address it now. See, e.g., *Blumberg Associates World-wide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161–62.

———————————